**SO ORDERED: October 25, 2013.**



**Frank J. Otte**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| DAVID WILLIAM HOOD, | ) | Case No. 11-11922-FJO-7 |
| Debtor. | ) | Chapter 7 |
| | ) | |
| KENNETH M. RUDE, | ) | |
| Plaintiff | ) | |
| | ) | Adversary No. 12-50002 |
| vs. | ) | |
| | ) | |
| DAVID W. HOOD, | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for trial upon the Complaint filed in this matter by Kenneth M. Rude ("Plaintiff") against David Hood ("Debtor or Defendant"). The Court held a trial on this matter and it is now ready for the Court's ruling.

The Court, having reviewed all pleadings in this matter, having considered the testimony of the witnesses and having weighed the credibility of the witnesses, having heard the arguments of counsel, and having reviewed all exhibits admitted during the trial, now makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

1

**FINDINGS OF FACT**

1.      On September 22, 2011,  David William Hood filed a Chapter 7 bankruptcy petition, in the United States Bankruptcy Court for the Southern District of Indiana under Case No. 11-11922-FJO-7.

2.      Plaintiff commenced an adversary action against the Defendant on January 3, 2012 by filing a Complaint to Determine Dischargeability of Debt under Adversary Proceeding No. 12-50002 ("Complaint").

3.      On March 8, 2012, the Defendant filed his Answer to the Plaintiff's Complaint.

4.      Plaintiff filed his Motion for Leave to Amend Complaint ("Motion") on October 31, 2012, which was subsequently granted by this Court.     Plaintiff filed its Amended Complaint to Determine Dischargeability of Debt ("Amended Complaint") on February 26, 2013.

5.      The Defendant filed his Answer to the Amended Complaint on March 4, 2013.

6.      The Court held a trial on this matter on July 17, 2013.

7.      The parties were given 30 days from the date of the trial to submit briefs and proposed findings.

**Lakeridge Property**

7.      Plaintiff was the developer of a certain subdivision located in Lafayette, Indiana which subdivision is commonly known as Scandia Subdivision ("Scandia").

8.      Defendant was in the business of building homes.

9.      The parties first became acquainted when Defendant purchased a lot from Plaintiff in Scandia; the last of which lots Defendant built a home for himself.

2

10.     In early February of 2005, Plaintiff, Defendant, and Shane Albregts organized Kronlokken Properties, LLC, a Florida limited liability company. Plaintiff was an owner of a fifty percent (50%) membership interest and Defendant and Shane Albregts each owning a twenty-five percent (25%) membership interest.

11.     Defendant was named Managing Member, Chief Manager and President of Kronlokken Properties, LLC.

12.     Albregts and Hood were also 50/50 members of another entity called Retirement Quest, LLC. ("Retirement Quest").

13.     Kronlokken Properties, LLC ("Kronlokken") was in the business of buying and selling real property, particularly in the State of Florida.

14.     Pursuant to Section 2.6 of the Operating Agreement of Kronlokken Properties, LLC, Defendant agreed to "keep up to date on the Florida property market and use his best efforts to pursue real estate investments for the LLC, acting to locate, research, investigate and purchase, maintain, market and sell such real estate for the benefit of the Company and the Members."

15.     Pursuant to Section 2.4 of the Operating Agreement of Kronlokken Properties, LLC, Plaintiff agreed to "lend to the Company, from time to time, as the Members unanimously agree, funds for use to purchase real estate. Such loan or loans shall be secured with mortgages in the real estate purchased."

16.     The loans were generally made from a personal line of credit Plaintiff had established at Old National Bank ("LOC"), which loans were evidenced by a Revolving Promissory Note executed by David Hood on behalf of Kronlokken Properties, LLC.

17.     Defendant had the sole control over, and the duty to maintain all records and documentation related to, the purchase and sale of real estate for Kronlokken Properties, LLC.

18.     The purchase price of the lots purchased by Kronlokken Properties, LLC ranged from $27,000.00 to $82,000.00 (the $82,021.00 lot was actually two lots) with an average price around $31,255.05.

19.     In September of 2005, the members of Kronlokken Properties, LLC decided to stop purchasing lots and sell the remaining inventory of properties it had accumulated since they viewed the market as having reached its peak.

20.     Prior to September 2005, Defendant had been seeking Plaintiff to build a home near the entrance of Scandia where Defendant had built his personal home, for the purpose of preserving the value and high class nature of the subdivision.

21.     Because the members of Kronlokken Properties, LLC had stopped purchasing real estate, Plaintiff and Defendant discussed that the LOC would then be available to fund the construction of the home near the entrance of Scandia and Plaintiff agreed to have Defendant build the home on Lot 7 of the Scandia Development.

22.     In September of 2005, Defendant requested a loan from Plaintiff in the amount of $250,000.00 ("Loan").

23.     Prior to Plaintiff's agreement to make the Loan, Defendant represented to Plaintiff that:

        a.     Defendant had purchased a certain 3.6 acre lot known as 520 Lakeridge Boulevard, Lehigh Acres, Florida 33972 ("Lakeridge Property") for a purchase price of $250,000.00;

4

b.     there was a pending sale of the Lakeridge Property for a purchase price of $300,000.00;

c.     the pending sale would not close for two months, but Defendant was in need of money immediately; and

d.     the Lakeridge Property had commercial value and was divisible into 5 buildable lots .

("Representations").

24.     In exchange for the Loan, Plaintiff was to receive full repayment of principal within 60 days plus one-half of the gain on the pending sale of the Lakeridge Property, which gain was to be $50,000.00, less the closing costs related to such sale.

25.     The Court finds that the Representations must have been made otherwise Plaintiff would not have known that his compensation was to be $25,000.00 (half of $50k) for making the Loan.

26.     Plaintiff agreed to the Loan in part due to the short repayment period, as Plaintiff would need the $250,000.00 to pay Defendant for the construction of the home on Lot 7 in Scandia.

27.     Plaintiff relied on the Representations of Defendant and but for these Representations would not have made the Loan.

28.     Plaintiff authorized $200,000.00 of the Loan to be paid to Defendant from Plaintiff's LOC on September 16, 2005.

29.     Plaintiff directed Defendant to take the remaining $50,000.00 of the Loan from the Kronlokken Properties, LLC operating account ("Account") which $50,000.00 was due Plaintiff pursuant to the sale of other properties by Kronlokken Properties, LLC.

30.    The remaining $50,000.00 was paid by two checks, one on October 11, 2005 in the amount of $48,000.00 and the second on December 5, 2005 in the amount of $2,000.00.

31.    The $200,000.00 draw on the LOC and the $50,000.00 in checks written on the Account were paid to Retirement Quest, LLC at the direction of Defendant.

32.    Retirement Quest, LLC is the limited liability company owned by David Hood and Shane Albregts.

33.    At the time of the Loan and the payments made in furtherance thereof, Plaintiff was unaware of Retirement Quest, LLC or that it was owned by Defendant and Shane Albregts.

34.    As Managing Member, Chief Manager and President of Kronlokken Properties, LLC, Defendant was responsible and had sole control over the Account.

35.    The records associated with the Account are kept in a checkbook which is under the control and in possession of Defendant.

36.    Plaintiff did not authorize payment of the $200,000.00 draw on his LOC or the $50,000.00 withdrawal from the Account to be paid to Retirement Quest, LLC.

37.    In December of 2005, when Plaintiff was expecting repayment of the Loan, Defendant indicated to Plaintiff that the sale of the Lakeridge Property was delayed due to a zoning issue, but that Defendant was working to clear this issue.

38.    On March 17, 2006, James Williamson, the Florida realtor used by David Hood, contacted the Lee County Department of Community Development requesting a "Zoning Verification Letter" and inquiring as to the number of units that may be built on the Lakeridge Property.

39.    During late spring of 2006, Defendant informed Plaintiff that the Lakeridge Property was designated "Open Space" by Lee County and therefore not buildable or divisible,

6

but indicated he would pursue the realtor, James Williamson with Remax, who he claimed to have relied upon in representing the land was buildable and divisible.

40.     On April 20, 2006, Defendant requested a meeting with Lee County Southwest Florida to discuss the zoning of the Lakeridge Property.

41.     During a conversation between Defendant and Plaintiff during the Summer of 2006,  Plaintiff was encouraging Defendant to pursue James Williamson for misrepresentations regarding the Lakeridge Property,  and Defendant then first informed Plaintiff that Defendant had not paid $250,000.00 for the Lakeridge Property, and that Defendant, through Retirement Quest, LLC, had purchased the Lakeridge Property on March 28, 2005 from South West Florida Property Investments, Inc. for a purchase price of only $186,118.36.

42.     On September 11, 2006 Defendant petitioned the Lee County Value Adjustment Board to adjust the assessed value of the Lakeridge Property from $152,040.00 to $11,500.00

43.     Because of the zoning of the Lakeridge Property and its lack of value, Defendant caused to be filed on October 24, 2006 an amended U.S. Return of Partnership Income for Kronlokken Properties, LLC for the reason that "the original return failed to account for loss on worthless investment in vacant land.  The land was purchased to be resold.  The parcel was identified as none buildable on 12/11/2005."

44.     Mr. Rude testified that it was not until Defendant provided documents in response to discovery requests during this lawsuit that Defendant informed Plaintiff that he did not had a sale of the Lakeridge Property pending for $300,000.00, but rather he only had a sale pending for a purchase price of $275,000.00.

45.    Defendant made the Representations knowing that the Lakeridge Property was purchased for $186,118.36, not $250,000.00; and there was a pending sale for $275,000.00, not $300,000.00.

46.    The Plaintiff testified that had he known that the property had only been purchased for $186,118.36 and that there was a pending sale of only $275,000.00, he would not have agreed to make the Loan because he would not have received his $25,000.00 compensation for the Loan (half of the difference between $250k and $275k is only $12,500.00).  The Court finds said testimony credible and reasonable under the facts.

47.    Defendant claims that the Loan was actually a purchase of the Lakeridge Property by Kronlokken Properties, LLC from Retirement Quest, LLC.

48.    Plaintiff testified he never would have agreed to such a purchase of the Lakeridge Property because:

(1) Retirement Quest, LLC would have made a profit of approximately $64,000.00;

(2) Kronlokken Properties, LLC was in the business of buying small lots that could be turned over quickly, whereas the Lakeridge Property was much more expensive than what Kronlokken Properties, LLC was in the business of purchasing and would require a major subdivision making it a property that could not be turned over quickly; and

(3) because the cost associated with major subdivisions as well as the prevailing cost of small lots at the time would make such a purchase a poor financial/investment decision.   The Court finds said testimony credible.

49.    Prior to the Lakeridge Property transaction, Kronlokken Properties, LLC had never purchased a property from Retirement Quest, LLC.  It would be a breach of the fiduciary duty owed by Defendant to Plaintiff and the members of Kronlokken Properties, LLC. for

Kronlokken Properties, LLC to purchase a property from Retirement Quest, LLC at a profit for Retirement Quest, LLC.

50.     Plaintiff testified he was unaware of the entity Retirement Quest, LLC until the summer of 2006 and had never authorized a payment from Kronlokken Properties, LLC or from the LOC to Retirement Quest, LLC., and this court finds said testimony credible and reasonable under the circumstance.

51.     Because of the "Open Space" designation, the Lakeridge Property is worth less than $12,000.00.

52.     Despite having received $250,000.00 of Plaintiff's money from Defendant, Retirement Quest, LLC was deeded the Lakeridge Property on May 9, 2007 and is still the current owner of said property.

53.     Defendant  failed to repay the Loan to Plaintiff or reimburse Kronlokken Properties, LLC.

## CONCLUSIONS OF LAW

1.     This Court has jurisdiction over the subject matter of this Complaint as a core proceeding pursuant to the provisions of 28 U.S.C. §§ 1334 and 157(b)(2)(I) and 11 U.S.C. § 523 since this is a proceeding to determine the dischargeability of a particular debt.

2.     Plaintiff seeks a determination that the debt owed to him by Defendant is nondischargeable under Sections 523(a)(2)(A) and (a)(4).

### §523(a)(2)(A)

3.     Under §523(a)(2)(A), an individual debtor shall not be allowed a discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud...".

4.     Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses and false representation. Although many courts have applied the same test to all three grounds, the Seventh Circuit has distinguished between the three grounds and has formulated two different tests, one for "false pretenses" and "false representation" and another for "actual fraud". In re Scarpello, 272 B.R. 691 (Bankr. N. D. Ill. 2002); citing McClellan v. Cantrell, 217 F.3d 890, 894 (7th Cir. 2000).

5.     To prevail on a nondischargeability claim under "false pretenses" or "false representation" set forth in §523(a)(2)(A), a creditor must prove all of the following elements: (1) the debtor obtained money, property or services through a false representation of fact; (2) which the debtor (a) either knew to be false or made with such reckless disregard for the truth as to constitute a willful misrepresentation and (b) made with intent to deceive; and (3) the creditor justifiably relied on the false representation to his detriment. Ojeda v. Goldberg, 59 F.3d 712, 716-17 (7th Cir. 2010). Scarpello, 272 B.R. at 700.

6.     "False pretenses" includes "implied misrepresentations or conduct intended to create and foster a false impression". Mem'l Hospital v. Sarama (In re Sarama), 192 B.R. 922, 927 (Bankr. N. D. Ill. 1996). "False pretenses" does not necessarily require overt misrepresentations. "Instead, omissions or a failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor". Id at 928.

7.     A "false representation" is an express misrepresentation that can be shown by the debtor's written statement, spoken statement or conduct. Scarpello, at 700. "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false

impression. Deady v. Hanson, (In re Hanson), 432 B.R. 758 (Bankr. N. D. Ill. 2010), citing, Trizna & Lepri v. Malcolm (In re Malcolm), 145 B.R. 259, 263 (Bankr. N. D. Ill. 1992).

8.     "Actual fraud" is broader than misrepresentation in that neither a debtor's misrepresentation nor a creditor's reliance is necessary to prove nondischargeability under "actual fraud" pursuant to §523(a)(2)(A). McClellan, 217 F.3d at 893; Scarpello, 272 B.R. 701. Rather, "actual fraud" is defined as "any deceit, artifice, trick or design involving direct and active operation of the mind used to circumvent and cheat another" which includes "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated". McClellan, 217 F.3d at 893 (citations omitted). In such cases, a creditor must prove (1) a fraud occurred; (2) the debtor intended to defraud the creditor and (3) the fraud created the debt that is the subject of the nondischargeability action. McClellan, 217 F.3d at 893; Scarpello, 272 B. R. at 701; Hanson, 432 B.R. at 772.

9.     A creditor must also prove the debtor acted with the intent to deceive under all prongs of §523(a)(2)(A). A debtor's intent to deceive is measured by his or her subjective intention at the time the representation was made. Scarpello, 272 B.R. at 700. "Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances". Hanson, 432 B.R. at 773.

10.     Finally, a creditor seeking nondischargeability under §523(a)(2)(A) must show causation between the debtor's acts and the creditor's resulting injury by proving that the creditor "justifiably relied" on the debtor's false pretense, false representation or fraud. Fields v Mans, 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

11.     "Justifiable" reliance is an intermediate level of reliance which is less stringent than "reasonable" reliance but more stringent than "reliance in fact". Id. at 71. "Justifiable"

reliance requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation" and imposes no duty on the creditor to investigate unless the falsity of the representation is readily apparent. Id at 70-72.

12.    "Justifiable" reliance is not measured from the objective person standard, but rather from the experiences and characteristics of the particular creditor. Id at 71.

13.    Plaintiff claims that the $250,000.00 debt which is the subject of this action was a personal loan to the Defendant, while Defendant claims that the $250,000.00 debt was the result of a purchase of real estate by Kronlokken Properties, LLC from Retirement Quest, LLC using Plaintiff's money.   Regardless of whether this debt was a loan or purchase of real estate, Plaintiff's claims succeed on all three of the possible prongs of §523(a)(2)(A).

14.    Although the evidence tends to show that the Representations were in fact made, even if the Court finds that they were not made,  Plaintiff can still succeed on all three of the possible prongs of §523(a)(2)(A).

**Actual Fraud**

15.    In order to succeed on a*ctual fraud*, Plaintiff is required to prove that the debt which is the subject of this action was created by Defendant's intentional use of a deceit, artifice, trick or design involving direct and active operation of the mind used to circumvent and cheat the Plaintiff.  McClellan, 217 F.3d at 893; Scarpello, 272 B. R. at 701; Hanson, 432 B.R. at 772. Proof of a misrepresentation by Defendant or reliance by Plaintiff is unnecessary for the actual fraud prong.  McClellan, 217 F.3d at 893; Scarpello, 272 B.R. 701.

**Purchase of Real Estate**

12

16.     In the present matter, the "deceit, artifice, trick or design" employed by Defendant was the self-dealing and interested transaction between Kronlokken Properties, LLC (Rude 50%; Hood 25%; Albregts 25%) and Retirement Quest, LLC (Hood 50%; Albregts 50%).   By transferring the Lakeridge Property from Retirement Quest, LLC to Kronlokken Properties, LLC, Defendant could effectively maximize his returns at the expense of the members of Kronlokken Properties, LLC, and primarily at the expense of Plaintiff, as it was all his money that was used to finance the acquisition of real estate.

17.     Defendant purchased the Lakeridge Property using Retirement Quest, LLC for $186,118.36 on the one hand and then with the other, using Plaintiff's money, purchased the Lakeridge Property from Retirement Quest, LLC on behalf of Kronlokken Properties, LLC for a $63,881.64 profit.   Because Defendant was solely responsible for buying and selling the property,   he was in a position that he could easily deceive or trick Plaintiff into authorizing a larger draw on the LOC than was necessary to purchase property and in the event the property did not sell for enough to cover the loan Defendant could blame it on fluctuations in the market.

18.     This resulted in Defendant making a profit of $63,881.64 for himself and Albregts on the sale to Kronlokken Properties, LLC and Kronlokken Properties, LLC incurring a loss of $238,500.00 ($250,000.00 less the $11,500.00 actual value) and then Defendant taking a loss on his taxes of his 25% of the loss to Kronlokken Properties, LLC (or a loss of $59,620.00) when in reality it was all of Plaintiff's money that was lost.

19.     Plaintiff, at a minimum, was wrongfully deprived of $63,881.64;  but had Plaintiff been aware that he was essentially giving away nearly $64,000.00 he would have never parted with the full $250,000.00.

20.     Because direct proof of fraudulent intent is often unavailable, as is the case here, fraudulent intent may be inferred from the surrounding circumstances. Hanson, 432 B.R. at 773.

21.     Defendant's sole defense is that he told Plaintiff that he was the owner of Retirement Quest, LLC and that he told Plaintiff that he was making a $63,881.64 profit on the Lakeridge Property transaction.   However, Plaintiff asserts that such statements were never provided; and if they were, he would have never agreed to give Defendant the $250,000.00. Moreover, Defendant has failed to provide any documentation supporting his claim that he fully informed Plaintiff regarding the Lakeridge Property transaction other than his own statement that he did make full disclosures to Plaintiff.   The fact that no negotiations were ever conducted regarding the substantial profit being made on the transaction also weighs against Defendant ever having made a full disclosure to Plaintiff regarding the transaction.

22.     The burden of proof as to Defendant's defense of consent/waiver is on Defendant. Seaboard Sur. Co. v. Harbison, 304 F.2d 247 (7th Cir. 1962).  Because he has not sustained his burden, the evidence, or lack thereof, tends to support the conclusion that Defendant did not fully disclose the fact that he was engaging in a transaction using Plaintiff's funds wherein Defendant was receiving a substantial sum of money over and above the fair market value of the Lakeridge Property.   Because Defendant did not fully disclose the nature of the Lakeridge Property transaction,  it can be inferred that he was intentionally withholding information from Plaintiff for the purpose of defrauding Plaintiff, specifically to acquire more money from Plaintiff than he could have otherwise had he been honest with Plaintiff.

23.     The damage suffered by Plaintiff is not limited to the $63,881.64, but rather the full $250,000.00 paid to Defendant because but for Defendant's "deceit, artifice, trick or design", Plaintiff would never have agreed to pay any of the $250,000.00.  The fact that the Lakeridge

Property is now worthless is only relevant to the extent of damages.  Had the Lakeridge Property held some value it could be transferred to Kronlokken Properties, LLC or sold for purposes of mitigating Plaintiff's damages, but because it is worthless and because neither Kronlokken Properties, LLC or Plaintiff have received anything in return for Plaintiff's $250,000.00 (including the property which is currently owned by Retirement Quest, LLC), then the full amount thereof is the measure of his damage as a result of Defendant's fraud.

24.     Therefore, the debt owed to Plaintiff by Defendant with respect to the Lakeridge Property is nondischargeable under Section 523(a)(2)(A) due to Defendant's *actual fraud* in the amount of $250,000.00.

### Loan of $250,000.00

25.     The debt owed to Plaintiff by Defendant is also nondischargeable under Section 523(a)(2)(A) due to Defendant's actual fraud if this was a loan rather than the purchase of real estate.

26.     Regardless of whether it was a "purchase price" or a "loan" the basis of the $250,000.00 payment to Defendant was the Lakeridge Property.

27.     The "deceit, artifice, trick or design" is Defendant's acquisition of $250,000.00 knowing that the property that was to be sold to repay the loan was only purchased for $186,118.36 and that there was no pending sale that would be sufficient to repay the loan plus Plaintiff's compensation for making said loan.

28.     Again, Defendant's defense is that he informed Plaintiff that the Lakeridge Property had been purchased for only $186,118.36 and that there was no pending sale.  However, the evidence supports the conclusion that Defendant did not fully disclose the fact that he was acquiring a loan for $63,881.64 more than what he paid for the Lakeridge Property or that there

was no pending sale. Because Defendant did not fully disclose the nature of the Lakeridge Property transaction, it can be inferred that he was intentionally withholding information from Plaintiff for the purpose of defrauding Plaintiff, specifically to acquire more money from Plaintiff than he could have otherwise had he been honest with Plaintiff.

29.      Therefore, regardless of whether this was a loan or purchase of real estate, the debt owed to Plaintiff by Defendant with respect to the Lakeridge Property is nondischargeable under Section 523(a)(2)(A) due to Defendant's *actual fraud*.

## False Pretenses

30.      In order to succeed on *false pretenses* Plaintiff must prove that the Defendant obtained money through a false representation which the Defendant either knew to be false or made with such reckless disregard for the truth as to constitute a willful misrepresentation and made with intent to deceive. Ojeda v. Goldberg, 59 F.3d 712, 716-17 (7th Cir. 2010). Scarpello, 272 B.R. at 700.

31.      Like actual fraud, *false pretenses* does not require overt misrepresentations, but instead includes implied misrepresentations or conduct intended to create and foster a false impression including omissions or a failure to disclose on the part of a debtor. Mem'l Hospital v. Sarama (In re Sarama), 192 B.R. 922, 927 (Bankr. N. D. Ill. 1996).

32.      Unlike actual fraud, however, *false pretenses* do require justifiable reliance on the part of the Plaintiff. Ojeda v. Goldberg, 59 F.3d 712, 716-17 (7th Cir. 2010). Scarpello, 272 B.R. at 700.

33.      The analysis of *false pretenses* is essentially the same as actual fraud in that the evidence supports the conclusion that Defendant knowingly failed to disclose material facts (i.e. that the Lakeridge Property was purchased for only $186,118.36 and there was no pending sale)

for the purpose of creating/fostering a false impression to Plaintiff that his $250,000.00 was sufficiently secured and would be promptly repaid.

34.    Plaintiff would not have loaned the money or purchased the Lakeridge Property had he known that it was only purchased for $186,118.36; and because the amount paid ($250,000.00) had no connection to or basis in anything offered to the Court by Defendant,  it can be inferred that Defendant intentionally created the false impression to Plaintiff that the $250,000.00 represented what was paid for the Lakeridge Property for the sole purpose of acquiring more money from Plaintiff than what he would have otherwise been able to.

35.     Justifiable reliance requires only that Plaintiff did not blindly rely on Defendant's statements.  <u>Fields v Mans</u>, 516 U.S. 59, 70-72, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).  This is measured from the experiences and characteristics of the particular creditor. Id at 71.

36.    Defendant was in a position of trust with Plaintiff as Managing Member, Chief Manager and President of Kronlokken Properties, LLC, and because of the years of previous business dealings with Defendant, it was reasonable and justifiable that Plaintiff had grown to confide in and trust Defendant.  For several years, Plaintiff and Defendant engaged in business together.  Defendant introduced Plaintiff to Old National Bank and helped Plaintiff obtain the LOC.  Defendant would then acquire Plaintiff's money for purposes of engaging in transactions in which Defendant was entrusted with handling all the related documentation.

**False Representation**

37.    The elements necessary to prove *false representation* are the same as false pretenses except that a false representation is an express misrepresentation (compared to an implied misrepresentation in the case of false pretenses) that can be shown by the Defendant's written statement, spoken statement or conduct. <u>Scarpello</u>, at 700.  However, the Defendant's

17

failure to disclose pertinent information may be a false representation as well where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression. Deady v. Hanson, (In re Hanson), 432 B.R. 758 (Bankr. N. D. Ill. 2010), citing, Trizna & Lepri v. Malcolm (In re Malcolm), 145 B.R. 259, 263 (Bankr. N. D. Ill. 1992).

38.     Therefore, notwithstanding the fact that the evidence shows that the Representations were in fact expressly made, if the Court finds that they were not made,  a failure on the part of Defendant to fully disclose the fact that Plaintiff's loan/purchase price was $63,881.64 more than what was paid for the Lakeridge Property in addition to the fact that there was not a pending sale (which ensured prompt repayment) constitutes a failure to disclose information which is sufficient to render this debt nondischargeable under Section 523(a)(2)(A) due to Defendant's *false representation* as well as Defendant's *actual fraud* and *false impression*.

39.     No other conclusion can be reached other than that Defendant acquired $250,000.00 from Plaintiff due to his express misrepresentations or, in the alternative, his failure to fully disclose the accurate nature of the transaction.  Either way, the debt which is the subject of this action is nondischargeable under Section 523(a)(2)(A).

### §523(a)(4)

40.     Under §523(a)(4), an individual defendant shall not be allowed a discharge for any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny".

41.     "Fraud or defalcation while acting in a fiduciary capacity" requires the debtor to owe a fiduciary duty to the creditor. Whether the debtor was acting in a fiduciary capacity is a question of federal law. O'Shea v. Frain (In re Frain), 230 F.3d 1014, 1017 (7th Cir. 2000). Generally, an express trust and the intent to create a trust relationship are adequate to find that

the debtor is a fiduciary. The Seventh Circuit, however, has determined that a debtor may be a fiduciary even in the absence of an express trust if there is a "difference in knowledge or power between fiduciary or principal which...gives the former a position of ascendancy over the latter". In re Marchiando, 1,3 F.3d 1111 (7th Cir. 1994); Frain, 230 F.3d at 1017. See also, In re Woldman, 9,2 F.3d 546 (7th Cir 1996) ("Section 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge in favor of the debtor seeking the discharge and against the creditor resisting discharge").

42.    It is not enough for the debtor to be a fiduciary. The debtor must also commit "fraud or defalcation" in his fiduciary capacity. "Fraud" for purposes of this section involves intentional deceit and "defalcation" has been defined as "a failure to account for money or property that has been entrusted to another". Hanson, 432 B.R. at 774-75. "Defalcation" involves tortious conduct which is more than mere negligence but less than fraud. Id.

43.    The debt owed to Plaintiff by Defendant with respect to the Lakeridge Property is nondischargeable under Section 523(a)(4) pursuant to both the *fraud* and *defalcation* prongs.

### Fraud

44.    In order to succeed under 523(a)(4),  the Defendant must have been acting in a fiduciary capacity with Plaintiff whether pursuant to an express trust, or in the absence of an express trust,  if there is a difference in knowledge or power between the Defendant and Plaintiff. In re Marchiando, 13 F.3d 1111 (7th Cir. 1994); Frain, 230 F.3d at 1017. See also, In re Woldman, 9,2 F.3d 546 (7th Cir 1996).

45.    "The existence of a 'fiduciary relationship' is a matter of federal law," In re Frain, 230 F.3d 1014, 1017 (7th Cir.2000), but "[b]ankruptcy law depends on, and implements, entitlements defined by state law." In re McGee, 353 F.3d 537, 540 (7th Cir.2003).  Under

19

Indiana law, "common law fiduciary duties, similar to the ones imposed on partnerships and closely-held corporations, are applicable to Indiana [limited liability companies]." Purcell v. Southern Hills Investments, LLC, 847 N.E.2d 991, 997 (Ind.Ct.App.2006).  Thus, Defendant owed a fiduciary duty to Plaintiff as a matter of law; as a member of Kronlokken Properties, LLC by virtue of his position as Managing Member, Chief Manager and President of Kronlokken Properties, LLC  pursuant to the express duty provided in the Kronlokken Properties, LLC Operating Agreement; and by virtue of the disparity in knowledge and power between Defendant and Plaintiff. Ruse v. Bleeke, 914 N.E.2d 1 (Ind.Ct.App. 2009); In re McCartin, 2011 WL 2443717 (Slip Copy) (Bank.S.D. Ind. 2011).

46.    Defendant was in Florida and was the one doing the day to day work with respect to the buying and selling of real estate.  Plaintiff, however,  was simply the source of funds to close the transactions.  The parties' experiences with one another and their history of dealings were such that their relationship became one of substantial trust where Plaintiff relied heavily on Defendant's honesty and full disclosure in supplying Defendant money with which to acquire real estate.  It was reasonable, given the circumstances, for Plaintiff rely as he did on the Defendant.  Given their respective positions,  there was a clear difference in knowledge and power between Plaintiff and Defendant which gave Defendant a position of ascendancy over the Plaintiff.

47.    Because of the fiduciary capacity within which Defendant was acting, each of the bases for the nondischargeability of this debt based on fraud which are discussed above also qualify this debt for nondischargeability under the *fraud* prong of 523 (a)(4).

**Defalcation**

48.    In order to succeed under *defalcation*, Plaintiff must prove that Defendant, while acting in a fiduciary capacity, failed to account for money or property that has been entrusted to him. <u>Hanson</u>, 432 B.R. at 774-75. However, with respect to intent, the Seventh Circuit requires something less than fraud but more than a mere negligent breach of fiduciary duty.  Id. see also, <u>In re Kusmierek</u>, 224 B .R. 651, 656–57 (Bankr.N.D.Ill.1998).

49.    The issue of notice pleading versus pleading with specificity arose at trial and it should be noted that "allegations of defalcation under Section 523(a)(4) do not need to meet the particularity requirements of Rule 9(b)."  <u>In Re Moran</u>, 152 B.R. 493, 495 (Bank.S.D.Ohio 1993); <u>In Re Eisman</u> 387 B.R. 219 (N.D. Indiana 2008) (citing <u>In Re Baker</u> 66 B.R. 652, 654 (Bank.D.Nev 1986))

50.    Defendant owed Plaintiff an express duty, pursuant to the Operating Agreement of Kronlokken Properties, LLC, to "keep up to date on the Florida property market and use his best efforts to pursue real estate investments for the LLC, acting to locate, research, investigate and purchase, maintain, market and sell such real estate for the benefit of the Company and the Members."

51.    Furthermore, pursuant to Florida law, common law fiduciary duties of care and loyalty are required by Florida Code Section 608.4226 and 608.423, which provide that each manager and managing member of a Florida limited liability company shall owe a duty of loyalty and a duty of care to the limited liability company and all of the members thereof.

52    When a fiduciary relationship exists,  it calls for the imposition of the same high standard of loyalty and care as a formal trust. <u>Matter of Marchiando</u>, 13 F.3d 1111 (7th Cir.

21

1994). A fiduciary breaches its duty of loyalty whenever it acts to benefit its own interests. Herdrich v. Pegram, 154 F.3d 362, 369 (7th Cir. 1998)

53.    Defendant owed Plaintiff fiduciary duties as a matter of law as a member of Kronlokken Properties, LLC, as Managing Member, Chief Manager and President of Kronlokken Properties, LLC, pursuant to the express duties provided in the Kronlokken Properties, LLC Operating Agreement, and by virtue of the disparity in knowledge and power between Defendant and Plaintiff.

54.    Defendant breached his fiduciary duties to Plaintiff by intentionally acting out of self-interest and in derogation of his duty of loyalty and his express duty to purchase real estate for the benefit of the Company and the Members, by acquiring the Lakeridge Property for a $63,881.64 profit to Retirement Quest, LLC.

55.    Defendant has failed to sustain his burden of proof for his defense of consent/waiver and because of Defendant's clear and intentional breach of his fiduciary duties to Plaintiff, the $250,000.00 debt is nondischargeable pursuant to Section 523(a)(4).

## Milwaukee Boulevard Property

Pursuant to Bankruptcy Rule 7052, the Court made it findings of fact and conclusions of law on the record with regard to the transaction relating to the Milwaukee Boulevard Property, which this court incorporates herein; and this Court found that the evidence presented did not support a finding by this Court that said amount was procured through actions which would render the debt nondischargeable.

The Court will enter a separate judgment from these Findings of Fact and Conclusions of Law and enter judgment in favor of the Plaintiff and against the Defendant in the sum of $250,000.00 and said amount will be nondischargeable under Bankruptcy Code Section 523 as more specifically set forth above.

###